# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 11, 2012 Session

## STATE OF TENNESSEE v. DEANGELO M. MOODY
## and MARTEZ D. MATTHEWS

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3252     Mark J. Fishburn, Judge**

---

**No. M2011-01930-CCA-R3-CD - May 9, 2013**

---

A jury convicted appellants, Deangelo M. Moody and Martez D. Matthews, of first degree murder. The trial court imposed life sentences. On appeal, both appellants challenge the sufficiency of the convicting evidence. In addition, appellant Matthews argues that the trial court erred in the following rulings: (1) admitting a hearsay statement pertaining to motive that was attributed to a severed co-defendant; (2) allowing certain statements, including "gang lingo"; (3) permitting testimony regarding witnesses' gang involvement for impeachment purposes; (4) admitting evidence of the personal history between two witnesses; (5) allowing the State to introduce a crime scene photograph that depicted a pool of blood; and (6) permitting the State to introduce proof of his conviction for possession of a handgun. After reviewing the record, the parties' briefs, and applicable law, we affirm the judgments of the trial court. However, we remand this cause for entry of judgment forms reflecting dismissal of appellant Matthews's indictment for employing a firearm during commission of a dangerous felony and appellant Moody's acquittal of the same charge.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Mark A. Kovach, Nashville, Tennessee, for the appellant, Deangelo M. Moody.

Anne M. Davenport, Nashville, Tennessee, for the appellant, Martez D. Matthews.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case involves the shooting death of the victim, a sixteen-year old female, L.J.[1] During a shoot-out that occurred on the street outside her home, the victim was struck by a stray bullet when it entered her home. A Davidson County grand jury indicted appellants and their co-defendant, Lorenzo Ortego Thomas, II, for one count of first degree felony murder and one count of employing a firearm during the commission of a dangerous felony. Co-defendant Thomas's case was severed from appellants' case, and the trial court conducted their joint trial from May 9-12, 2011.

Inez Johnson, the victim's mother, testified that around 4:00 p.m. on April 25, 2009, she and the victim were at their home on Chesapeak[2] Drive. They were lying down in Ms. Johnson's bedroom when they heard gunshots. Ms. Johnson stated that she "instinctively . . . dropped and rolled." She further stated that "instead of laying low and rolling from the bed, [the victim] raised her body up" and was struck by a bullet. The victim began bleeding from her mouth. Ms. Johnson called 9-1-1 and rendered aid to the victim in an attempt to stop the bleeding. She said that she could not tell from where the victim was bleeding. She recalled, "[B]lood was just everywhere, . . . and I was right there beside her[,] and I knew [she] wasn't going to make it[,] and I watched her take her last breath . . . ."

Christopher Cote, a detective with the Metro Nashville Police Department ("MNPD"), testified that around 4:00 p.m. on April 25, 2009, he responded to a call at 3652 Chesapeak Drive. The paramedics were already at the scene when he arrived. Officer Cote was advised that a sixteen-year-old female had been shot. He entered the home and observed the victim lying on the floor, bleeding profusely. The paramedics transported the victim to the hospital, and additional police officers arrived at the scene. Officer Cote stated that he secured the scene and advised his superior officers and investigators as to what had occurred.

Officer Cote recalled that Officer Brian Eaves arrived at the scene. He stated that a witness approached Officer Eaves and gave him a hat that the witness had found. He placed the hat, which the witness found in the street to the right of the victim's house, in an evidence bag and gave it to the crime scene investigators. Officer Cote stated that he also found multiple shell casings of different calibers at the scene.

---

[1] We have used the initials of the minor victim of this crime to protect her identity.

[2] The transcript spells the street name as "Chesapeake." However, the street sign shown in one of the crime scene photographs spells the name "Chesapeak."

Lynne Mace, a crime scene investigator with the MNPD, testified that she investigated the scene in this case. She drew a diagram of the scene, which she described for the jury. The diagram depicted the locations of bullet cartridge casings. Investigator Mace also photographed and collected the cartridge casings. Investigator Mace recalled that there were two .45 caliber automatic casings and six 9mm casings. She identified photographs that she had taken of the crime scene, including a photograph of the strike mark of the bullet that entered the victim's house.

Christopher Bridges[3] testified that he lived at 3648 Chesapeak Drive. He stated that on April 25, 2009, at approximately 4:00 p.m., he was walking down Chesapeak Drive with Deandre Williams. As they were walking, a car with four or five people inside of it pulled up and began shooting. Christopher began to run, but he heard more than five shots fired. The State showed him a photograph of a vehicle and asked if it was the vehicle he observed on April 25, 2009, to which Christopher responded, "Yes, sir." Christopher stated that he was given the opportunity to speak with the police about what he observed, but he told them that he "really didn't see anybody, didn't see anything." He said that he did not want to speak with the police and that they forced him to go to the precinct. Christopher admitted that in April 2009, he was a member of the 107 Underground Crips but denied that he was still a member.

On cross-examination, Christopher testified that he did not know why someone would want to shoot at him. He stated that the shooting came from the driver's side of the vehicle. He did not know appellants and said that the first time he saw them was on the news. Christopher stated that he had an adequate opportunity to view the car because it passed him and made a u-turn. He said that the vehicle's license plate was in the window and that the vehicle's bumper was not damaged. Christopher later testified that the vehicle that he identified in the photograph had damage on its bumper. Christopher said that he ran between some houses when the people in the vehicle started shooting; however, the victim's house was not one of them.

Deandre Williams testified that he lived with Christopher and Christopher's family in April 2009. On April 25, 2009, he was walking to a friend's house with Christopher when he heard gunshots. He ran away and was unable to see from where the gunshots originated. He stated that he was sending text messages on his cellular telephone and did not observe any nearby vehicles or people. However, he recalled telling the police that he saw a small blue or green vehicle that looked like a Honda. He explained that he saw the vehicle before he and Christopher began walking. Mr. Williams further testified that he heard more than five

---

[3] Multiple witnesses share the surname Bridges; thus, we will refer to them by their first names to avoid confusion. In doing so, we intend no disrespect.

gunshots. He estimated that he was three houses away from 3652 Chesapeak Drive when the gunshots began. He ran in the opposite direction from the victim's house.

Mr. Williams denied being a member of or affiliated with the107 Underground Crips. He stated that he did not know whether Christopher was a member of the gang and denied noticing a tattoo of a gun with the numbers "107" on Christopher's hand.

On cross-examination, Mr. Williams testified that he did not know appellants and had never seen them before the day of trial. Mr. Williams did not know why anyone would shoot at him. He stated that he did not know anything about the incident and was only testifying because the State forced him to do so.

Evan Bridges testified that he is the grandfather of Christopher Bridges and that they lived at 3648 Chesapeak Drive. At around 4:00 p.m. on April 25, 2009, Evan was outside in the backyard of his home. He heard gunshots and went toward his front yard. When he arrived at the front yard, Evan determined that the gunshots were coming from a small green car that was driving down the street. When shown a photograph of a vehicle, Evan stated that the vehicle in the photograph was the same size, but the car he saw on the day of the shooting looked like a Honda. He observed the heads of three African-Americans in the vehicle and stated that the people in the vehicle were "some young guys."

Evan recalled speaking with three or four police officers, but he denied telling Officer Eaves that he saw two of the three people in the vehicle shooting into 3652 Chesapeak Drive. Approximately fifteen to twenty minutes after the shooting ceased, Evan found a black cap in the middle of the street that was not there before the shooting. He thought that it might have belonged to one of the shooters, so he gave it to the police.

On cross-examination, Evan testified that he did not actually see anyone shoot a weapon. He clarified that the vehicle he saw was green and that the vehicle in the photograph looked like it was blue. Evan stated that he did not see the black cap fall from the vehicle from which the shots were fired.

Quontez Caldwell testified that appellant Moody and Ortego Thomas are his half-brothers through their father, but he only became acquainted with them a short time prior to this incident. Mr. Caldwell stated that on April 25, 2009, appellant Moody and Mr. Thomas picked him up from his grandmother's house in appellant Moody's vehicle. He identified appellant Moody's vehicle from an exhibit photograph. In addition to his half-brothers, two other males whom he did not know were in the vehicle. He identified appellant Matthews in the courtroom as one of the other passengers in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, the people in the car saw "somebody they had a beef with

[sic][,] and they shot at them." He recalled that Mr. Thomas said, "'There go [sic] somebody we beefin' with [sic].'" The driver then turned the vehicle around and drove back up Chesapeak Drive. He said that appellants and Mr. Thomas began shooting at a person he knew as "C. Trigger." Mr. Caldwell did not recall having previously testified that appellant Matthews had a 9mm pistol, that appellant Moody had a ".45 or .40," or that Mr. Thomas had a "38 revolver," but he acknowledged that if he had previously so testified, then it was the truth. He stated that neither he nor the driver had a weapon that day. After the shooting, the men dropped Mr. Caldwell off in the middle of the street. He said that he did not speak with appellants about the shooting after it happened.

Mr. Caldwell stated that the police attempted to interview him. The first two times they attempted to speak with him, he told them that he did not know anything about what happened because he just "didn't want to tell them nothing [sic]." Mr. Caldwell denied being a member of the Hoover Deuce Crips. He denied testifying to being a member in July 2009 and said that if his being a member of the Crips was reflected in his statement, it was not the truth.

On cross-examination, Mr. Caldwell denied that a detective with MNPD brought him in for questioning because he had received information that Mr. Caldwell had claimed that he killed the victim. He further denied getting a new "teardrop tattoo" on his face. Mr. Caldwell did not recall telling the detective that he was anywhere near Chesapeak Drive, that he was with someone named "T.O.," that he was in a Chevrolet Impala, or that he did not know the color of the Impala. He stated that he did not know appellant Moody's real name and that he only knew his father by the name "Tango."

Mr. Caldwell admitted that he spoke with another detective a few weeks later but denied that he changed his story about being in an Impala with T.O. Mr. Caldwell admitted that appellant Moody picked him up and then proceeded to pick up another person, at which time the other person began driving the vehicle. He remembered seeing "C. Trigger" and stated that "guns were pulled[,] and they started shooting." In a subsequent interview with Kathy Morante, an assistant district attorney, Mr. Caldwell denied any knowledge of his brothers' having problems with "C. Trigger" and stated, "I didn't know they had no [sic] beef with him." He testified that his problem with "C. Trigger" was "[s]omething about . . . some child issues" and that it was not significant. Mr. Caldwell denied that the "child issues" concerned his child's mother and could not remember stating that there was bad blood between him and "C. Trigger" or indicating that "C. Trigger" had tried to do him harm in the past. He declined the opportunity to review the transcript of his statement.

Kathy Morante, an assistant district attorney in Nashville, testified that in April 2009, she was assigned to handle juvenile transfers for the office. In the course of her work, Ms.

Morante explained that it was fairly common to have witnesses testify for the State who had charges pending against them, as was the case with Quontez Caldwell. She further explained that a cooperating witness in this situation was sometimes given "use immunity." "Use immunity," she testified, was an agreement between the witness, his or her attorney, and the State that provided, "[I]f you sit down and talk with us, we're not going to use anything you say during this period of time that we're talking against you to prosecute you so long as you tell the truth." She added, "[W]e specifically reserve the right to use any other evidence that we can come up with against that person, or as I said earlier, if we determine that [the] person is being untruthful, then we can prosecute them." Mr. Caldwell's use immunity agreement form was entered as an exhibit at trial. Ms. Morante stated that the most serious charge Mr. Caldwell faced in the summer of 2009, when he was fifteen years of age, was an attempted homicide that was unrelated to the instant case. He was taken into custody on June 12, 2009, and in November 2009, he entered a guilty plea to aggravated assault and vandalism and was committed to a secure facility of the Department of Children's Services ("DCS"). Ms. Morante noted that Mr. Caldwell also had an unresolved robbery charge. She explained that DCS determines the appropriate time to "step him down from one facility to another and . . . to release him back into the community."

On cross-examination, Ms. Morante testified that Mr. Caldwell had just been released from DCS when this incident occurred. She met with Detective Jackson and believed that Mr. Caldwell could have some information pertinent to the case, but she did not know whether he was involved. On redirect examination, Ms. Morante clarified that the attempted homicide charge for Mr. Caldwell was wholly unrelated to this incident.

Detective Gene Davis of the MNPD testified that on May 15, 2009, he conducted a traffic stop in the area of Nolensville Road for a traffic ordinance violation. He observed three people inside the vehicle he stopped, and during a search of the vehicle, he found a loaded 9mm Glock semi-automatic pistol. Detective Davis stated that appellant Matthews claimed ownership of the weapon, at which time he was taken into custody. Detective Davis identified the weapon, which was entered as an exhibit. He also identified appellant Matthews, who was seated in the courtroom.

Detective Cody O'Quinn of the MNPD testified that he was involved in serving a search warrant for a vehicle located at 314 Kern Drive on June 18, 2009. The vehicle was a green 1999 Kia. He determined that the vehicle was registered to appellant Deangelo Moody and his mother. He identified the temporary drive-out tag found inside the automobile and noted that it would have been valid on the date of this incident, April 25, 2009. On cross-examination, Detective O'Quinn stated that the Kia automobile in the exhibit photograph appeared green in color to him.

Detective Lawrence Brown, also from the MNPD, testified that he obtained buccal swabs from both appellants on February 9, 2011, at the prosecutor's request. He explained that a buccal swab is used to obtain liquid evidence, usually saliva, from an individual. The swabs were packaged and taken to the Tennessee Bureau of Investigation ("TBI") to be analyzed for DNA comparison.

Agent Mark Dunlap of the TBI Crime Laboratory was accepted by the trial court as an expert in forensic chemistry and serology. He testified with regard to his DNA analysis of a black cap. From his testing, he determined that the "DNA profile from the cap was a mixture of genetic material from two individuals." From the standards submitted in February 2011, ten of the thirteen testing sites indicated that the major contributor of DNA on the cap was appellant Matthews.

On cross-examination, Agent Dunlap explained that three of the thirteen testing sites were inconclusive, stating, "[T]here just wasn't enough DNA there to obtain a full profile, so those sites didn't yield results. It doesn't mean that they didn't match, it just means there was no result at those sites." He acknowledged that no DNA belonging to appellant Deangelo Moody was found on the hat.

Agent Robert Daniel Royse of the TBI Crime Laboratory was accepted by the trial court as an expert in firearms and tool mark identification. He explained the operation of the Glock 9mm Luger semiautomatic pistol, the parts of a live cartridge, and the firing cycle process. Agent Royse testified that in his work, he examines the unique set of markings found on every firearm, which can be thought of as a mechanical fingerprint. In making an identification, he test fires the weapon and takes the test bullets and cartridge cases and compares them to the evidence. If the unique characteristics are present on both the evidence and the test material, he concludes that they have a common origin and that they were fired from the same weapon. Agent Royse was provided six spent .45 caliber automatic cartridge casings and two 9mm cartridge casings in April 2009, and in January 2011, he was provided a 9mm weapon for analysis. He testified that the two 9mm casings provided to him were fired from the weapon he received in January 2011.

Chief Medical Examiner Dr. Amy McMaster testified that a former colleague had performed the victim's autopsy but that she had reviewed and agreed with the report that was prepared. She illustrated the bullet entry wound and the path of travel through the victim's body. She identified the projectile recovered from the victim's body and described the procedure in preserving it as evidence. Dr. McMaster stated that the bullet injured the aorta, the trachea, and both lungs and that even immediate medical intervention could not have saved the victim's life. In summary, Dr. McMaster testified that the cause of the victim's

death was a gunshot wound to the torso and that the manner of death was a homicide. At the close of Dr. McMaster's testimony, the State rested its case-in-chief.

The defense called William Jackson, a former officer with the MNPD, who testified that he was the lead detective in the investigation of the victim's death. He arrived at the scene approximately five to ten minutes after receiving the call and remained there for approximately three and one-half hours. His duties included making sure the officers secured the crime scene for purposes of investigating and collecting evidence. Detective Jackson was present during the victim's autopsy and collected the bullet recovered from the victim's body as evidence. He recalled testifying at appellants' detention hearing that the recovered bullet was a large fragment and stated, "I didn't know at the time if it was a [.]45 or a [.]40[.] I guessed that it was one of those too big to be a [.]38 or a [.]22."

Detective Jackson testified at length concerning his three interviews with Quontez Caldwell. He recalled that his first interview with Mr. Caldwell was at the end of April and the second interview was on June 12th. He explained that he uses conversation as his interviewing technique to get to the truth. He would not make promises of assisting in getting charges dismissed or lowered, but he acknowledged that he would "talk for someone if they cooperate" and admitted that "[he did not] know how the [District Attorney] works."

On cross-examination, Detective Jackson recalled that during the first interview with Mr. Caldwell on April 30, 2009, Mr. Caldwell denied being at the scene or having anything to do with this incident. During the second interview on June 12, 2009, Mr. Caldwell began to cooperate and identified appellant Matthews in a photograph array as one of the individuals involved in this shooting. Detective Jackson testified that ultimately, Mr. Caldwell provided seating positions in the vehicle and stated that appellants were two of the three people involved in shooting at Christopher Bridges and Deandre Williams on April 25, 2009.

Upon this evidence, the jury convicted both appellants of first degree felony murder committed during an attempted first degree murder, and the trial court imposed life sentences.

I. Analysis

A. Sufficiency of the Evidence

Both appellants challenge the sufficiency of the evidence sustaining their convictions for felony murder.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain appellants' convictions, the State must have proven beyond a reasonable doubt that appellants killed the victim "in the perpetration of or attempt to perpetrate . . . first degree murder," as charged in the indictment. Tenn. Code Ann.§ 39-13-202(a)(2) (2010). First degree premeditated murder, the underlying felony, is defined as "a premeditated and intentional killing of another." *Id.* at § 39-13-202(a)(1). The jury was instructed that "attempt" meant that one "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id.* at § 39-12-101(a)(2).

Viewed in the light most favorable to the State, a brief synopsis of the facts in this case demonstrates sufficient evidence underlying appellants' convictions. Officer Cote responded to the call at 3652 Chesapeak Drive and was advised by paramedics that a sixteen-year-old female had been shot. After securing the scene, he and Officer Eaves received into evidence a black cap that a witness had found in the street. Officer Cote also retrieved two .45 caliber automatic shell casings and six 9mm shell casings.

Christopher Bridges testified that as he and Mr. Williams were walking down Chesapeak Drive, a car with four or five people inside of it pulled up, and some of the occupants began shooting. He heard more than five shots fired. He identified a photograph of a vehicle and stated that it appeared to be the vehicle from which the shots were fired. Christopher stated that he had an adequate opportunity to view the car because it passed him and made a u-turn. Mr. Williams also recounted that on April 25, 2009, he was walking to a friend's house with Christopher when he heard gunshots. He recalled telling the police that he saw a small blue or green vehicle that looked like a Honda. He explained that he saw that vehicle before he and Christopher began walking.

Evan Bridges heard gunshots around 4:00 p.m. on April 25, 2009, and went toward his front yard. When he arrived at the front yard, Evan determined that the gunshots were coming from a small green car that was driving down the street. Approximately fifteen to twenty minutes after the shooting ceased, Evan found a black cap in the middle of the street that was not there before the shooting. He thought that it might have belonged to one of the shooters, so he gave it to the police.

Quontez Caldwell testified that the vehicle in the picture introduced at trial was appellant Moody's vehicle, and it was the vehicle in which appellant Moody, Mr. Thomas, and some other individuals picked him up that day. He identified appellant Matthews in the courtroom as one of the other passengers riding in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, they saw someone with whom they had a disagreement and both appellants and the severed co-defendant began firing shots at him.

On May 15, 2009, Detective Davis conducted a traffic stop in the area of Nolensville Road for a traffic ordinance violation. During a search of the vehicle, he found a loaded 9mm Glock semi-automatic pistol, which appellant Matthews claimed as his own. Detective Cody O'Quinn of the MNPD testified that he was involved in serving a search warrant for a vehicle located at 314 Kern Drive on June 18, 2009. The vehicle was a green 1999 Kia. He determined that the vehicle was registered to appellant Deangelo Moody and his mother.

Detective Brown obtained buccal swabs from both appellants on February 9, 2011. Agent Dunlap analyzed the swabs and compared them to the DNA found on the black cap.

From his testing, he determined that ten of the thirteen testing sites indicated that the major contributor of DNA on the cap was appellant Matthews.

Agent Royse received six spent .45 caliber automatic cartridge casings and two 9mm cartridge casings in connection with this case in April 2009. In January 2011, he received a 9mm weapon for comparison and determined that the two 9mm casings provided to him were fired from the weapon he received in January 2011.

Detective Jackson testified that Mr. Caldwell identified appellant Matthews in a photograph array as one of the individuals involved in this shooting. Detective Jackson stated that ultimately, Mr. Caldwell provided seating positions in the vehicle and stated that appellants were two of the three people involved in shooting at Christopher Bridges and Deandre Williams on April 25, 2009.

Based on this evidence, the jury had sufficient evidence to convict both appellants of felony murder perpetrated during an attempt to commit first degree murder. "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2010). The jury could have found that appellants formed the intent to kill after appellants and their cohorts passed "C. Trigger," a person with whom they had a disagreement, walking down the street, at which time they made a u-turn in order to confront "C. Trigger." In shooting at "C. Trigger," appellants performed an act intending to cause an element of first degree murder to occur without further action on their part. *Id.* at § 39-12-101(a)(2). However, they missed their intended target and instead shot through the victim's home. "[A] killing in the course of an attempted first degree murder is first degree felony murder. If the prosecution establishes that a defendant attempts to commit the premeditated and deliberate first degree murder of a specific victim but instead kills an unintended victim, the defendant may be guilty of first degree felony murder. This result is plain from the statutory definition of the crime . . . ." *Millen v. State*, 988 S.W.2d 164, 167-68 (Tenn. 1999). As such, neither appellant is entitled to relief on this issue.

B. Admissibility of Quontez Caldwell's Testimony

As set forth above, Mr. Caldwell testified that Mr. Thomas, a co-defendant whose case was severed from appellants' case, said, "'There go [sic] somebody we beefin' with [sic].'" In response, the driver of the vehicle turned around and drove back up Chesapeak Drive so that the occupants could fire at the intended victims. Appellant Matthews claims that the statement constituted inadmissible hearsay and that admission of it violated his right to confront the witnesses against him.

The State argues that appellant Matthews acquiesced in the trial court's ruling permitting Mr. Caldwell's statement. However, our reading of the transcript of the bench conference at trial indicates that appellant's approval only pertained to the parties' agreement that the State would not delve into the underlying reason for the "beef" with Mr. Bridges and not to the admissibility of the statement concerning the "beef." To characterize appellant's statement as acquiescing to the admissibility of the comment in question is unreasonable.

Nonetheless, the State correctly notes that appellant failed to lodge a contemporaneous objection to this statement. Appellant Matthews filed several motions in limine before the trial began. "Motion in Limine #6: Right to Confront Witness" sought a ruling on the admissibility of this evidence. Prior to the jury being sworn, the trial court ruled that the evidence was admissible. Whether counsel must make a contemporaneous objection at trial to preserve an issue for appeal after arguing a motion in limine must be determined on a case by case basis in light of the record developed in connection with the trial court's ruling. *State v. McGhee*, 746 S.W.2d 460, 464 (Tenn. 1988). However, for the purpose of preserving the record for appeal, we consider an objection to be contemporaneous if trial counsel objects in the form of a motion in limine *and* obtains a ruling on the issue from the trial court. *State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001) (emphasis added). Thus, this issue was preserved for appellate review.[4]

Appellant's position is that Mr. Thomas's statement, repeated in court by Mr. Caldwell, was a statement "made by the co-defendant that implicate[d] the defendant" and thus violated his right to confront the witnesses against him as defined by *Bruton v. United States*, 321 U.S. 193 (1968). Our supreme court has held that "[t]he *Bruton* rule proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfess[ing] co-defendant's Sixth Amendment right of confrontation." *State v. Elliot*, 524 S.W.2d 473, 477 (Tenn. 1975). However, a statement by a co-defendant that is not hearsay "raises no Confrontation Clause concerns." *Tennessee v. Street*, 471 U.S. 409, 414 (1985); *see State v. Alexis Mason and Terrence Harris*, No. W2010-02321-CCA-R3-CD,

---

[4] With regard to this issue, appellant Matthews states in his brief that "Rule 36(b) of the Tennessee Rules of Appellate Procedure provides for relief when an error 'involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'" In so stating, appellant seemingly concedes that this issue is subject to plain error review only. Although the motion in limine pertaining to this issue was brief, counsel fully developed appellant's argument during a hearing on the motion and obtained a ruling thereon. As such, for the reasons stated herein, we will review this claim on the merits.

2013 WL 1229447, at *11 (Tenn. Crim. App. Mar. 27, 2013). Thus, we must first determine whether the challenged statement constitutes hearsay.[5]

This court has held that declarations used to prove the effect on a listener are not hearsay:

> "[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement."

*State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.01[7], at 8-23 (5th ed. 2005)); *see also State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (noting that the victim's statement was not hearsay because it was offered for its effect on the hearer, the defendant, and established evidence of his motive in returning to the scene of the crime later in the day and threatening the victim).

The *Carlos Jones* case is analogous to the instant case. Mr. Thomas's statement, repeated in court by Mr. Caldwell, was not offered to prove the truth of the matter asserted, i.e., that the occupants of the vehicle had an ongoing disagreement with Mr. Bridges. Rather, the statement was offered for its effect on the listener(s), who turned the vehicle around, brandished their weapons, and began firing at Mr. Bridges and Mr. Williams. Because the statement was not hearsay, the trial court's ruling did not implicate *Bruton* or appellant Matthews's right to confront witnesses against him. He is not entitled to relief on this issue.

---

[5] We are aware of the disagreement among panels of this court and also with our supreme court regarding the appropriate standard of review of the admissibility of hearsay evidence. *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (in considering an issue involving hearsay, holding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); *Pylant v. State*, 263 S.W.3d 864, 871 n.26 (Tenn. 2008) (maintaining that the standard of review for hearsay issues is abuse of discretion); *Willie Perry, Jr. v. State*, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *3 (Tenn. Crim. App. July 11, 2012) (stating that standard of review for admissibility of evidence is abuse of discretion). *But see State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard); *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (holding that appellate review of hearsay issues is de novo with no presumption of correctness); *Willie Perry, Jr.*, 2012 WL 2849510, at *7 (Bivins, J., concurring) (applying de novo standard of review to hearsay issues). It is not necessary for us to compare the merits of each position because, for purposes of our determination of this issue, the evidence is admissible under either standard of review.

### C. Admissibility of the Terms "Homeboy" and "Homie"

Appellant Matthews filed a motion in limine seeking to prohibit the admission of gang activity or affiliation. He renewed the motion in limine when Mr. Williams testified that he had been walking to his "homeboy's house" when the shots were fired. In denying the motion, the trial court noted that there had been no testimony that "homeboy" implied gang affiliation and that the word was commonly used. Appellant now contends that the trial court erred in allowing the State to introduce an audiotaped statement wherein Mr. Caldwell referred to appellant as his "homeboy" and "homie."

The State correctly noted that appellant Matthews failed to include citations to relevant authorities or appropriate references to the record. Pursuant to Tennessee Court of Criminal Appeals Rule 10(b), this court treats as waived those issues that are unsupported by authorities, argument, or references to the record. *See also* Tenn. R. App. P. 27(a)(7)(A). However, because of the seriousness of the offenses of which appellants are convicted, we will address this issue to facilitate any further appellate review.

The decision whether to admit evidence rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *See State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). A trial court abuses its discretion when it applies "an incorrect legal standard or [reaches] a decision [that] is illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (*citing Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)). In this case, the trial court properly noted that there had been no testimony that "homie" or "homeboy" were terms signifying gang affiliation and that the terms were commonly used. We cannot conclude that the trial court abused its discretion in denying appellant Matthews' motion in limine on this basis. He is not entitled to relief.

### D. Admissibility of Gang Affiliation of the States' Witnesses

Before the trial began, the trial court held a hearing on the admissibility of evidence concerning gang involvement of two of the State's witnesses. During the hearing, the court and the parties discussed a proposed limiting instruction regarding any testimony that might be received regarding gang involvement. The trial court agreed to instruct the jury that it should only consider witnesses' potential gang involvement in conjunction with its effect on their willingness to cooperate with law enforcement.

The State asked Mr. Caldwell whether he was involved with a gang, and he denied any affiliation. The State also made the same inquiry of Mr. Bridges, who stated that he had previously been involved in a gang but that he was no longer affiliated with it. Neither

-14-

appellant lodged a contemporaneous objection to either witnesses' testimony. Appellant Matthews now complains that said testimony was highly prejudicial, so much so that a "limiting instruction cannot remove the taint" for him.

Although appellant did not lodge a contemporaneous objection at trial, for the purpose of preserving the record for appeal, he raised this issue in his "Motion in Limine #5: Neighborhood Gang Activity," and the trial court ruled on the motion before trial. Thus, this issue was preserved for appellate review. *See Alder*, 71 S.W.3d at 302.

At trial, Mr. Caldwell denied any gang involvement; thus, with regard to him, no error occurred. Mr. Bridges admitted prior gang activity but claimed that he was no longer so affiliated. Any error with regard to his testimony is tenuous, at best. However, we note that both witnesses were presented by the State. Appellant Matthews maintains that evidence of gang affiliation is highly prejudicial. Accepting the premise of this statement, the evidence prejudiced the *State*, not appellant Matthews. In addition, the limited testimony of gang involvement was offered to demonstrate why the witnesses were hesitant to cooperate with law enforcement officers, not to attack their credibility. *See, e.g., State v. Johnson*, 743 S.W.2d 154, 158 (Tenn. 1987) ("testimony . . . was not offered to impeach the credibility of appellant but simply to explain [the witness's] own alleged fear of appellant and his reason for not reporting the homicide to the police for some time after it occurred," and thus, it was admissible). The limited evidence concerning gang affiliation in this case was introduced for the purpose of explaining why the witnesses were reluctant to cooperate. The trial court fashioned a jury instruction to remedy any unfair prejudice to appellants. Juries are presumed to follow instructions from the trial court. *State v. King*, 973 S.W.2d 586, 592 (Tenn. 1998). Appellant is not entitled to relief.

### E. Admissibility of Evidence Concerning History between Mr. Caldwell and Mr. Bridges

Appellant Matthews contends that the trial court erred in permitting the State to play an audiotaped recording of Mr. Caldwell's statement in which he references a disagreement between himself and Mr. Bridges. The State responds that the evidence was admissible and highly probative of intent.

Although appellant did not lodge a contemporaneous objection at trial, for the purpose of preserving the record for appeal, he raised this issue in his "Motion in Limine #8: Evidence of Caldwell's History with Christopher Bridges," and the trial court ruled the evidence admissible. Thus, this issue was preserved for appellate review. *See Alder*, 71 S.W.3d at 302.

We review the trial court's ruling on the admissibility of this evidence for abuse of discretion. *See Forbes*, 918 S.W.2d at 449. The challenged statement that was introduced via audiotape was in essence the same testimony that Mr. Caldwell offered from the witness stand at trial. This evidence is, at most, cumulative. Moreover, we agree with the State that the evidence of the relationship between Mr. Bridges and Mr. Caldwell was relevant to establish motive, in that Mr. Caldwell had an ongoing disagreement with Mr. Bridges about the parentage of a child. Appellant is not entitled to relief on this issue.

## F. Admissibility of Crime Scene Photograph

Generally, Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). Photographic evidence is relevant, and thus admissible, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Tenn. R. Evid. 403, Adv. Comm'n Note). Furthermore,

> A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 653 (Tenn. 1997); *State v. Stinnet*, 958 S.W.2d 329, 331 (Tenn. 1997). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949. Our supreme court has held that photographs that depict pools of blood are admissible as long as they "are not gruesome and supplement and clarify oral testimony describing the crime scene. *State v. Duncan*, 698 S.W.2d 63, 69 (Tenn. 1985).

Prior to being admitted, the trial court considered the photograph and opined that it was "far from being so outrageous as to prejudicially affect the jury" and that it was the only photograph that "clearly corroborate[d] what Ms. Johnson said in terms of her grabbing the bathroom towel in an effort to stop the flow of her daughter's blood." This court has reviewed the photograph challenged by appellant Matthews in the context of Ms. Johnson's trial testimony. While there is a copious amount of blood in the photograph, the victim's body is not visible in the photograph. The photograph was relevant to Ms. Johnson's testimony. We cannot conclude that the trial court abused its discretion in admitting the photograph in question. Appellant is not entitled to relief on this issue.

### G. Admissibility of Proof Regarding Appellant's Arrest and Conviction for Illegal Possession of Handgun

Appellant Matthews claims that the trial court erred in admitting evidence of the facts underlying his juvenile adjudication for possession of a handgun. The record reflects that Detective Davis conducted a traffic stop on May 15, 2009, involving a vehicle in which appellant Matthews was a passenger. Upon searching the vehicle, Detective Davis found a Glock semi-automatic 9mm pistol, of which appellant claimed ownership. Subsequent testing of the weapon revealed that it fired the shell casings that officers collected at the crime scene in this case and thus was the murder weapon. At the close of Detective Davis's testimony, the State moved to introduce appellant's juvenile adjudication for possession of a handgun, advancing that it constituted an admission under oath. The trial court allowed the adjudication into evidence.

In his brief, appellant argues that Tennessee Rule of Evidence 404(b) should have precluded admission of this evidence. However, our analysis concludes that appellant Matthews's possession of the murder weapon less than one month after the victim was killed was relevant to establish his identity as one of the perpetrators of the crime. *See* Tenn. R. Evid. 404(b), Adv. Comm'n Cmt. The probative value of the evidence was not outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b). Appellant is not entitled to relief.

### CONCLUSION

Based on our review of the record and the parties' briefs, we discern no error and affirm the judgments of the trial court. The convictions of first degree murder are affirmed. However, the record contains no judgment forms disposing of both appellants' indictments

for employing a firearm during commission of a dangerous felony.  Thus, we remand the case for entry of judgments reflecting dismissal of appellant Matthews's indictment and appellant Moody's acquittal of this charge.

_____
ROGER A. PAGE, JUDGE